1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Luke W. Sironski-White (State Bar No. 348441)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
           lsironski@bursor.com

**FARNESE PC**
Peter J. Farnese (State Bar No. 251204)
700 S. Flower St.
Suite 1000
Los Angeles, CA 90017
Telephone: (855) 935-5322
E-mail: pjf@farneselaw.com

**SINDERBRAND LAW GROUP, P.C.**
Greg Sinderbrand (State Bar No. 179586)
5805 Sepulveda Blvd. #801
Sherman Oaks, CA 91403
Telephone: (818) 370-3912
E-mail: greg@sinderbrandlaw.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LISA FELICE, JUSTIN GARFIELD, and NICHOLAS POSTON, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GUARDIAN TECHNOLOGIES LLC and LASKO PRODUCTS LLC,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br><u>JURY TRIAL DEMANDED</u> |

CLASS ACTION COMPLAINT

Plaintiffs Lisa Felice, Justin Garfield, and Nicholas Poston ("Plaintiffs") bring this action on behalf of themselves and all others similarly situated against Defendants Guardian Technologies LLC ("Guardian") and Lasko Products LLC ("Lasko") (collectively, "Defendants").  Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

## NATURE OF THE ACTION

1.     This is an action arising from the false and misleading representations that Defendants make about their GermGuardian AC4300 and AC4825 Series[1] Air Purifiers (the "Products" or, the "Purifiers") and replacement bulbs.

2.     In an era of great anxiety about airborne pathogens, Defendants prey on consumers' fears by misrepresenting that its Air Purifiers can kill a material amount of bacteria, viruses and mold by way of a small ultraviolet-c ("UV" or "UV-C") bulb housed in a chamber inside each of its Products.  UV-C light is a type of ultraviolet light that *can* effectively kill pathogens, but only under the right conditions.

3.     Unbeknownst to Plaintiffs and other similarly situated consumers, however, there are multiple fatal flaws with the design of the Products such that the UV bulbs do not, and cannot, provide any material antimicrobial benefits for the consumer.  In reality, use of the UV-emitting bulbs has no material purpose other than to give Defendants cover for selling their Products at inflated prices.

4.     Defendants know this but have continued hocking their wares *and* replacement UV bulbs since the outset of the COVID-19 pandemic.

5.     Defendants' false and misleading representations regarding the UV feature induced reasonable consumers like Plaintiffs into purchasing the Products and replacement bulbs.  Had

---

[1] This includes model numbers AC4825E, AC4825W, and AC4825DLX.  Further research and discovery may reveal that more of Defendants' air purifiers are similarly incapable of removing a material amount of airborne pathogens.  Plaintiffs reserve the right to amend their complaint as more information comes to light.

1  Plaintiffs and all other similarly situated consumers known that, contrary to Defendants'

2  representations, the UV feature in the Purifiers provides no actual material antimicrobial benefit,

3  they would have paid less for the Purifiers and the replacement bulbs or not purchased them at all.

4       6.      Plaintiffs assert claims on behalf of themselves and all other similarly situated

5  purchasers of Defendants' Air Purifiers and replacement UV-C bulbs for: (i) violation of

6  California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*; (ii)

7  violation of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq.*;

8  (iii) violation of California's Consumers Legal Remedies Act ("CLRA"), Cal. Civil Code §§ 1750,

9  *et seq.*; (iv) fraud; and (v) breach of express warranty.

10                                  **PARTIES**

11      7.      Plaintiff Lisa Felice is a citizen of California, and resides in the city of San Leandro,

12  California.  While in California, Plaintiff Felice purchased the GermGuardian AC4825DLX 3-in-1

13  Air Cleaning Air Purifier from Defendants' Amazon store page around approximately April 2021

14  for $99.99.  Plaintiff Felice reviewed and relied on Defendants' warranties and representations

15  about the Product's antimicrobial capabilities prior to purchasing the Product.  Plaintiff Felice

16  reasonably relied on Defendants' representations and believed that the UV-C bulb housed within

17  the Product was capable of killing a material amount of bacteria, viruses and mold as they initially

18  pass through the unit, making it more effective against these airborne pathogens than standard air

19  purifiers which only have HEPA filters.  Had Defendants not warranted and represented that the

20  Product's UV feature was capable of sanitizing the air and killing a material number of airborne

21  pathogens as they did, Plaintiff Felice would not have purchased the Product or would have paid

22  substantially less for it.

23      8.      Plaintiff Nicholas Poston is a citizen of California, and resides in the city of Castro

24  Valley, California.  While in California, Plaintiff Poston purchased the GermGuardian AC4825E 4-

25  in-1 Air Cleaning Air Purifier from Defendants' Amazon.com store page on January 26, 2023 for

26  $99.99.  Plaintiff Poston reviewed and relied on Defendants' warranties and representations about

27  the Product's antimicrobial capabilities prior to purchasing the Product.  Plaintiff Poston

28

reasonably relied on Defendants' representations and believed that the UV-C bulb housed within the Product was capable of killing a material amount of bacteria, viruses and mold as they initially pass through the unit, making it more effective against these airborne pathogens than standard air purifiers which only have HEPA filters.  Had Defendants not warranted and represented that the Product's UV-C feature was capable of sanitizing the air and killing a material number of airborne pathogens as they did, Plaintiff Poston would not have purchased the Product or would have paid substantially less for it.

9.      Plaintiff Justin Garfield is a citizen of California, and resides in the city of Hermosa Beach, California.  While in California, Plaintiff Garfield purchased the GermGuardian AC4825E 4-in-1 Air Cleaning Air Purifier from Defendants' Amazon.com store on November 25, 2022 for $64.99.  In that same Amazon.com order, Plaintiff Garfield also purchased the GermGuardian AC4300BPTCA for $129.89.  Plaintiff Garfield reviewed and relied on Defendants' warranties and representations about the Products' antimicrobial capabilities prior to purchasing the Products.  Plaintiff Garfield reasonably relied on Defendants' representations and believed that the UV-C bulbs housed within the Products were capable of killing a material amount of bacteria, viruses and mold as they initially passed through the unit, making it more effective against these airborne pathogens than standard air purifiers, which only have HEPA filters.  Had Defendants not warranted and represented that the Product UV feature was capable of sanitizing the air and killing a material number of airborne pathogens as they did, Plaintiff Garfield would not have purchased the Products or would have paid substantially less for them.

10.      Defendant Guardian Technologies, LLC, is a limited liability company organized under the State of Delaware with its principal place of business at 6251 Bluestone Blvd., Euclid, Ohio 44132.

11.      Defendant Lasko Products, LLC is a Pennsylvania limited liability company with its principal place of business at 820 Lincoln Ave, West Chester, Pennsylvania 19380.

## JURISDICTION AND VENUE

12.      This Court has subject matter jurisdiction over this action pursuant to the Class Action

Fairness Act of 2005, Pub. L. No. 109-2 Stat. 4 ("CAFA"), which amends 28 U.S.C. § 1332, at new subsection (d), conferring federal jurisdiction over class actions where, as here: (a) there are 100 or more members in the proposed classes; (b) some members of the proposed classes have a different citizenship from Defendants; and (c) the claims of the proposed class members exceed the sum or value of five million dollars ($5,000,000) in aggregate. *See* 28 U.S.C. § 1332(d)(2) and (6).

13.     This Court has personal jurisdiction over Defendants because Defendants conduct significant business in California such that they have purposefully availed themselves of the privilege of doing business in California.

14.     Venue is proper in this Court under 28 U.S.C. § 1391 because Defendants transact significant business within this District, at least one plaintiff resides within this District, and a substantial part of the events giving rise to Plaintiffs' claims took place within this District.

## FACTUAL ALLEGATIONS

### A.     Air Purifiers And The Air Purifier Market

15.     The Environmental Protection Agency estimates that "about 67 million tons of pollution were emitted into the atmosphere in the United States" in 2021.  This pollution comes at great cost to human health: "[p]oor air quality is responsible for an estimated 100,000 premature deaths in the United States each year."  Exposure to pollution has also been linked to symptoms of depression and anxiety, and general cognitive decline.

16.     As a result, public concern about air pollution is high.  In fact, one 2019 survey found that, of about 1000 responses, 43% of respondents indicated that they had a "great deal" of concern about air pollution in the United States, and 31% indicated that they had a "fair amount" of concern for air pollution.  Taken together, 74% of respondents expressed concern about air pollution.  This is in line with the EPA's concerns: the agency places indoor air pollution among the top five environmental health risks.

17.     Concerns about air quality would skyrocket in 2020, however, as wildfires intensified and the COVID-19 virus shut down the globe.  The virus's airborne transmissibility

1  necessitated mask mandates.  The N95 mask became daily-wear, and people were forced to think

2  about the air they breathe more than ever before.

3      18.    As expected, consumer demand to combat airborne pathogens helped the air

4  purifiers market explode from $8.05 billion in 2019 to $13.97 billion in 2022.  As one market

5  analyst put it: "[t]he COVID-19 pandemic has increased the demand for air purifiers, with the

6  growing awareness of COVID-19 associated respiratory ailments and the rising need to curb cross-

7  contamination.  Factors such as increasing airborne diseases and growing health consciousness

8  among consumers are driving the market."

9      19.    Air purifiers come in various forms.  Among the most effective purifiers are

10  purifiers with HEPA filters.  HEPA is an acronym for "High Efficiency Particulate Air."

11      20.    Specifically, a HEPA filter is a type of pleated mechanical filter that typically

12  consists of sheets of randomly arranged fiberglass or plastic fibers held in an accordion shape by

13  aluminum separators.  To be called a HEPA filter, the filter must capture at least 99.97% of dust,

14  pollen, mold, bacteria, and any airborne particles with a size of 0.3 microns.  0.3 microns is not the

15  floor, however.  It is the size at which a particle is most likely to escape from the filter.  Particles

16  bigger or smaller than 0.3 microns have a greater than 99.97% chance of being caught in a HEPA

17  filter.

18      21.    Even though the SARS-CoV-2 virus is about 0.125 microns in diameter, the CDC

19  has stated that "air purifiers can help reduce airborne contaminants, including viruses, in a home or

20  confined space."  This is because most COVID-19 viruses are not floating in the air alone, they

21  typically hitch a ride on a larger particulate that is expelled when an infected person breathes out,

22  coughs, or sneezes.  These particles are much larger than 0.3 microns and are efficiently trapped by

23  HEPA filters.

24      22.    The reason why consumers may care that the air purifier they purchase meets the

25  HEPA standard is self-evident.  It offers near certain protection against the transmission of airborne

26  pathogens in the home (if the purifier is given enough time to circulate the air), and it can also filter

27  out pollution, such as smoke from wildfires, which are growing ever more frequent.

28

23.     Consumers, especially those with pre-existing pulmonary and immune disorders want the assurance that the HEPA standard provides, and are willing to pay more for filters which meet or exceed the 99.97% efficiency HEPA standard and protect against pathogens.  A 2020 study by Molekule, Inc. (makers of a competing air purifier) confirmed this: 77% of respondents said they would be willing to pay more for an air purifier that removes viruses.

24.     So, there is a captive and potentially lucrative audience of consumers who want an air purifier that has robust purification features.  The problem for manufacturers is that consumer expectations are met by the HEPA filter, and it is difficult to differentiate oneself from all the other competitors when everyone is offering essentially the same product.  Defendants found a solution.

25.      By inserting an ultraviolet lightbulb into their Products and marketing it as a key feature, Defendants represented to consumers that its Products had materially greater antimicrobial capabilities than air purifiers which "only" used a HEPA filter.

26.     Testing shows that these representations were wholly false and misleading.  The UV "feature" in Defendants' Products is nothing more than a ploy to squeeze more money from unsuspecting consumers.

**B.     UV-C Technology And Air "Sanitation"**

27.     Defendants market themselves based on a technical limitation with HEPA filters: while a HEPA filter can effectively trap viruses, it cannot kill them directly.[2]  This is where the germicidal ultraviolet-c ("UV-C") light bulb comes in.

28.     The ultraviolet light spectrum spans from about 180 to 380 nanometers ("nm"), just below the visible light spectrum which spans from 380nm to 700nm.  The term "nanometers" refers to the wavelength of light, and the shorter the wavelength of light, the more energetic it is.  Germicidal UV-C light is at the shorter end of the ultraviolet spectrum, with wavelengths between 180nm and 280nm.

---

[2] Useful marketing, to be sure, but this conveniently ignores the fact that a pathogen that is trapped in a HEPA filter isn't going anywhere.  It may not be killed *by* the filter, but it will still die inside of it.



29.     Ultraviolet light has the potential to kill pathogens because it damages their DNA, RNA, and proteins.  However, this potential is tied to the wavelength of UV light that the pathogen is exposed to.  The longer the wavelength (closer to 400nm) the *less* effective the UV light is at killing microbes.  UV-C light is in what's called the "germicidal" range of the UV spectrum, from 180nm to 280nm.  A sweet-spot where UV light is most destructive to microbial structures.  This is why UV-C light is known as "germicidal ultraviolet-c."

30.     Germicidal efficacy is determined by two other variables: the amount of UV light being emitted at once (i.e., the intensity), and how long the microbe is exposed to the light.

31.     Thus, there are three factors which determine how effective a UV-C device can be at inactivating pathogens: the wavelength of UV-light emitted, the amount of UV-light emitted at once, and how long a pathogen will be exposed to the light as it passes through the product.  These three metrics (wavelength, intensity of radiation, and time exposed to radiation) combine to form what's known as the "UV Dose."  The unit of measurement for UV Dose is milli-Joules per square centimeter ($mJ/cm^2$).  For example, 90% of COVID-19 virus particles are inactivated by a UV Dose of roughly $2 \ mJ/cm^2$.[3]

---

[3] Measuring viral inactivation with UV-C light is a difficult task, and the scientific community has yet to come to a true consensus as to the UV Dose required.  $2mJ/cm^2$ is a conservative estimate that gives a UV-C device manufacturers such as Defendants the greatest chance to substantiate any antimicrobial (i.e., "kills 99.99% of germs") claims.  Studies have estimated 90% UV-C inactivation of aerosolized SARS-CoV-2 particles to be achievable with UV Doses from between $0.42 \ mJ/cm^2$ up to $7.0 \ mJ/cm^2$ or more.

32.     So, for a manufacturer  to legitimately claim that its product can "kill" certain microbes, its device must (1) expose all microbes to UV-C radiation for an appropriate amount of time, and (2) use a bulb capable of delivering the range of UV Doses required to neutralize each of the claimed microbes.  This is important because the UV Dose required to kill specific microbes can vary greatly.

33.     COVID-19 is a *particularly sensitive* pathogen when it comes to UV-C radiation. Other pathogens, and especially mold spores, require significantly greater UV Doses to get anywhere close to 90% inactivation.  For example, for 90% inactivation: *E-Coli* requires about 2.2 $mJ/cm^2$, *Staphylococcus Aureus* (staph infection) requires about 3.5 $mJ/cm^2$, influenza strains require about 5.5 $mJ/cm^2$, rhinovirus (the common cold) requires about 6.5 $mJ/cm^2$, and *Aspergillus niger* (common mold) requires about 119 $mJ/cm^2$.

34.     Meeting such UV Dose requirements in home air purification products has always been difficult.  In fact, according to the Centers for Disease Control and Prevention, "the use of UV lamps and HEPA filtration in a single unit would not be expected to have any infection-control benefits not provided by use of the HEPA filter alone."[4]

35.     The reason for this is simple: the UV-C bulb in a small home air purifier is too small and weak to effectively kill a material amount of pathogens as they pass through the unit.  The wavelength is right, but the amount of radiation and the time exposed to radiation are both too low. Either the bulb would have to emit significantly more UV-C radiation over a shorter span of time, or the air would have to move at a near stand-still to effectively deliver the UV Dose required to inactivate a pathogen.  Keeping the air still would be anathema to one of an air purifier's core functions: circulating a room's worth of air through it over a reasonably short period of time.

36.     The large majority of consumers do not know that UV-C bulbs in consumer-grade air purifiers are ineffective, however, and so a goldmine of profit has presented itself to air purifier manufacturers like Defendants.  Jamming a UV-C bulb into an air purifier allows the Defendants to suggest that their Products offer some benefits that a purifier with only a HEPA filter cannot

---

[4] See www.cdc.gov/mmwr//preview/mmwrhtml/00035909.htm

provide.  Namely, that they will kill a material amount of airborne pathogens more effectively than

a purifier that "only" has a HEPA filter.   The truth is, however, that the UV-C light adds **no value**

to the Air Purifiers and functions merely as a way for manufacturers like Defendants, to upsell their

consumers.

### C.   Defendants' Products And Advertising

37.   Defendants manufacture multiple air purifiers that feature UV-C bulbs in their

design.  The Air Purifiers at issue in this action are those that house a UV-C bulb in a compartment

at the top of the device.[5]  Pictured and demarcated in red below.



38.   Defendants manufacture, distribute, and sell the Air Purifiers to California residents

and nationwide.  To take advantage of consumers and its competitors, and knowing full well that

---

[5] Notably, this compartment is almost entirely shielded off from the fan compartments below,
meaning that little air actually circulates around the bulb, and only an insignificant amount of light
leaves the compartment.  The Air Purifiers at issue in this action feature virtually the same upper
chamber bulb design, and are therefore substantially similar for all relevant purposes.

---

CLASS ACTION COMPLAINT                                                                                      10

1   its Products cannot deliver on various UV-C claims that allege independent and incremental germ-

2   killing benefits, Defendants engage in various unfair and deceptive practices to ensure that their

3   Products are purchased by consumers over any competing HEPA filter equipped air purifiers.

4        39.    For instance, on the Products' uniform packaging, Defendants state that the UV-C

5   light in the Products "**goes beyond filtration** to kill germs" and "**destroys the DNA of germs**

6   eliminating their ability to reproduce" (emphasis added):



19       40.    Apart from the express claims, the above illustration conveys the net impression to

20  consumers that the UV-C light kills a material amount of microbes as they pass through the unit.

21       41.    Another illustration in its advertising (below) confirms that Defendants intend that

22  the UV-C light acts as a third, independent stage of filtration in the Products:

1
2
3
4
5
6
7
8
9

[Image of product with 3-STAGE FILTRATION and callout text]

10    42.    To further legitimize their antimicrobial claims, Defendants added fine text to the

11   bottom-right corner of the image above, stating: "Tested with *Staphylococcus Albus*, and

12   *Escherichia Coli*, *Aspergillus Niger*, and *Phi-X174*."  As noted in paragraph 33 above, these

13   pathogens require significantly greater UV Doses to be inactivated than what is required for

14   COVID-19.

15    43.    On top of this, Defendants' website also claims that "UV-C light helps reduce

16   airborne viruses such as influenza, staph, rhinovirus":

17

18    44.    These are not isolated advertisements.  Throughout the Class Period, Defendants

19   have made consistent representations that the UV-C bulb in the Products "kills" a material amount

20   of germs, bacteria, and viruses.  For instance, Defendants represented on their website:

21
22   
23

24    45.    Defendants have also claimed: "More than just a filter, the UV-C light kills germs,"[6]

25   and, "our air purifiers kill airborne bacteria."

26   _____
     [6] https://web.archive.org/web/20190107030917/https://www.guardiantechnologies.com/ac4825-3-
27   in-1-air-cleaning-system-with-true-hepa-uv-c-sanitizer-and-odor-reduction-22-inch-tower-by-
     germguardian.html/
28

46.     Further, Defendants have attempted to trick consumers into believing that the UV-C and HEPA features provide a combined 99.97% removal benefit when, in fact, the HEPA standard alone requires at least 99.97% removal of small particles.



47.     On the 2020 version of Defendant GermGuardian's website[7], GermGuardian made the following claims:

- "GermGuardian AC4825 4-in-1 Air Purifier with HEPA Filter, **UVC Sanitizer** and Odor Reduction, 22-Inch Tower" (emphasis added);

- "UV-C Light Works with filters to kill germs and bacteria";

- "UV-C Kills Airborne Mold & Germs";

- "What is UV-C light?
  UV-C is part of the ultra-violet light spectrum that is filtered out by the earth's atmosphere. The "C" stands for the particular frequency of UV light that kills germs.";

- "Why is UV-C light so effective?
  UV-C light is highly effective at penetrating thin-walled germs like viruses and bacteria. The light alters the genetic structure of the germ, and they die."

48.     The above claims show Defendants' pattern and practice of touting the UV-C feature of its Air Purifiers as providing a substantial, premium, benefit over competing products which only use HEPA filters.  Defendants' tactic has been wildly successful.  As of this writing, the GermGuardian AC4825 series are the 14th best-selling air purifiers on Amazon.com, selling well over 5,000 units a month on the site.

---

[7] https://web.archive.org/web/20200807013011/https://www.guardiantechnologies.com/ac4825-3-in-1-air-cleaning-system-with-true-hepa-uv-c-sanitizer-and-odor-reduction-22-inch-tower-by-germguardian.html

49.     Defendants proclaim their success boldly.  Before they had received the CLRA notice letter sent by Plaintiffs' counsel, they featured this image on their Products' Amazon pages:



50.     As to the replacement bulbs, Defendant's website emphasizes that bulbs in the AC4300 and AC4825 series Air Purifiers "**need[] to be replaced every 10-12 month**[s]", and that "use of this genuine Guardian Technologies®™ replacement part **will maintain the product's performance**" (emphasis added).[8]  Defendants charge $19.99 per bulb.

51.     Defendants are selling a lie, however.  The benefits Defendants so boldly claim their Products provide are illusory.  Based on the design of the Products, it is scientifically impossible for the Products' UV-C bulb to provide any materially significant antimicrobial benefits over competing air purifiers that only have a HEPA filter.  But, Defendants do not need to take the word of Plaintiffs' counsel on this.  As explained below, the past President of the International Ultraviolet Association tested the UV-C feature of the AC4825 series of Air Purifiers and determined it does not, and cannot, provide any material benefit.

**D.      Defendants' Products Do Not, And Cannot, Perform As Advertised**

52.     As described below, Defendants' representations that the UV-C bulb in the Products is capable of providing any material germ "killing" or "reduction" benefits as air initially passes

---

[8] https://lasko.com/collections/replacement-bulbs/products/lb4000-replacement-uv-c-bulb-for-ac4800-model-series-air-cleaning-systems

1    through the unit are demonstrably false.

2        53.     Internationally renowned expert on the use of UV-C light in air and water

3    disinfection, James Malley, PhD., has reviewed the AC4825 series purifier and analyzed its design

4    and its UV-C light "feature."  Dr. Malley is Professor of Civil Engineering at the University of

5    New Hampshire, UNH-CEE, past President of the International Ultraviolet Association (IUVA),

6    and currently serves as Chair of the IUVA Task Force Sub-Group on Development of UV

7    Disinfection Guidance and Validation of Surface and Air Disinfection Devices, and is Editor-in-

8    Chief of *UV Solutions* (formerly *IUVA News*).  He is uniquely qualified to evaluate the Products,

9    their design, and the capabilities of their UV-C light.

10       54.     As discussed by Dr. Malley in his report, the Purifier's ability to sanitize the air with

11   UV light "is based upon delivering an adequate UV dose to the media being treated (*i.e.*, air, water

12   or solid surface) that will achieve the acceptable level of inactivation of a target pathogenic micro-

13   organism (i.e., bacteria, virus, protozoa or fungi – aka mold)."

14       55.     Dr. Malley explains that: "UV dose is measured as the irradiance (I) multiplied by

15   the fluid residence time (T).  Irradiance is measured by calibrated optical instruments typically

16   termed radiometers and is reported in units of milliWatt per square centimeter ($mW/cm^2$).

17   Irradiance is typically measured for each wavelength of light output by the UVGI device."  In lay

18   terms, irradiance is the intensity of UV radiation being emitted and residence time is how long a

19   particle is exposed to that radiation as it travels through the product.

20       56.     Dr. Malley further explains that: "Contact time is measured for most UVGI devices

21   treating air or water as the volume of the reaction chamber divided by the volumetric flowrate of

22   the media being treated and is reported in seconds.  Since UV dose = I*T the units for UV dose are

23   then reported as $mW\text{-}sec/cm^2$ and since 1 mW-sec = 1 mJ the overall units of UV dose are

24   $mJ/cm^2$."  "The UV dose is then compared to the specified UV dose response to determine the

25   performance as percent removal of the UVGI device."

26       57.     In other words, as discussed above in Section B, the ability of a UV device to

27   sanitize the air (AKA the "UV Dose" it delivers) is determined by the wavelength of light, the

28

amount of light being emitted, and the amount of time the pathogen would be exposed to that light as it travels through the product.

58.     According to Dr. Malley, common pathogens require the following approximate UV Doses to be neutralized at a rate of 90% (meaning, 10% of pathogens survive the exposure):

| Pathogen | UV Dose |
|---|---|
| Pathogenic *Escherichia coli* 0157:H7 | 2.2 mJ/cm$^2$ |
| *Staphylococcus aureus* | 3.5 mJ/cm$^2$, |
| Common influenza strains | 2.0 to 8.9 mJ/cm$^2$ |
| *Aspergillus niger* | 119.0 mJ/cm$^2$ |
| Rhinovirus (comparable to poliovirus and other enteroviruses) | 6.5 mJ/cm$^2$ |
| SARS-CoV-2 virus | 2 mJ/cm$^2$ |

59.     Dr. Malley evaluated the Product and its design.  As described in his report, he assessed the UV lamp and measured the UV irradiance for the upper chamber (UC), upper fan chamber (UFC), and lower fan chamber (LFC) of the Product.  Dr. Malley also measured the residence times (time it takes for a particle to travel through a certain space) for each chamber at both the minimum and maximum flow settings.



60.     Dr. Malley then determined the UV dose for each chamber "by multiplying the irradiance by the residence time for the maximum and minimum flow settings" as follows:

| Chamber | UV Dose (Min. Flow Rate) | UV Dose (Max. Flow Rate) |
|---|---|---|
| UC | 0.93 mJ/cm$^2$ | 0.43 mJ/cm$^2$ |
| UFC | (Below Detection) | (Below Detection) |
| LFC | (Below Detection) | (Below Detection) |
| | | |
| Flow Weighted Average UV Dose | 0.019 mJ/cm$^2$ | 0.008 mJ/cm$^2$ |

61.     As can be seen in the chart above, UV Dose is highest (0.93 mJ/cm$^2$) at the minimum flow rate because that is when air is moving the slowest through the device and has the longest time to be exposed to any UV-C radiation.

62.     Unfortunately for Plaintiffs and the Class, Dr. Malley concluded that:

> The UV microbial inactivation aspects of the GermGuardian® Device Model Number: AC4825E produced by Guardian Technologies, LLC (26251 Bluestone Boulevard Euclid, OH 44132) were evaluated and found to be insignificant based upon inadequate often zero UV dose resulting from insignificant often zero UV irradiance combined with short residence times significantly less than 1 second at maximum and minimum flow settings of the device. **This inadequate if not undetectable UV dose delivery would result in overall performance that would provide no significant inactivation of viruses, bacteria or mold.**

63.     To put it simply, the UV-C "feature" in Defendants' Products is not capable of providing any meaningful protection to consumers above and beyond what an air purifier with just a HEPA filter can provide.

64.     As Dr. Malley's testing shows, the upper and lower fan chambers receive UV Doses below the detectable limit, so any air that flows through those two chambers will not receive any significant UV Doses either.  This is the vast majority of air because that is where the fans are located.

65.      Only air that circulates through the Upper Chamber where the bulb is housed will receive any measurable UV Dose, and even then, the dose is so low that not a single contaminant mentioned by Defendants in their advertising would be acceptably neutralized.  For instance, the highest UV Dose measured by Dr. Malley was 0.93 mJ/cm$^2$ inside the Upper Chamber with the fans on their lowest setting.  This is not even half of the 2 mJ/cm$^2$ required to neutralize 90% of SARS-CoV-2 (COVID-19) particles.

66.     What's more, the Upper Chamber is blocked off from the rest of the device and does not have a fan, so hardly any air will circulate through that chamber to begin with.

67.     Below is a clear view of the Upper Chamber with the UV-C bulb in the center.  As can be seen, it is predominantly shielded off from the two Fan Chambers, with thick foam padding at the bottom:#



68.     Pictured below is the back of the device.  A metal plate covers the Upper Chamber where the UV-C bulb is housed, demarcated in red:



69.     Dr. Malley's testing shows conclusively that any of Defendants' Products that have the AC4825's multi-chamber design fail to deliver on their air purification promises.[9]  Defendants' Purifiers are no better at cleaning and sanitizing the air than regular, cheaper, HEPA-filter-equipped air purifiers that do not have expensive UV-C bulbs shoehorned in their designs.

70.     The fact that, under rare circumstances, the bulb *may* inactivate an immaterial amount of pathogens is not enough to save Defendants.  In the antimicrobial context, consumers expect at least 99.9% efficiency.  Hand sanitizers and soaps are the prevailing antimicrobial products consumers are familiar with.  The claim made consistently with these products is "kills 99.9% of germs," and that is what consumers expect for any other product claiming to have antimicrobial features.

71.     Defendants know this, which is why they advertise the UV-C "feature" next to the HEPA-filter efficiency claim of 99.97%.  Consumers are paying for a feature that *sanitizes* the air *better* than a HEPA-filter.  The UV-C bulb in Defendants' Products does not do that.  Not even close.  Testing of the Products shows that the UV bulbs they use could theoretically kill only a minute fraction of microbes which pass through the Products.  The "benefit" it provides is immaterial to consumers.

72.     In an attempt to save face, Defendants may argue that the Products function as advertised because the air just needs to be recirculated multiple times and eventually every pathogen is neutralized.  This argument is nonsensical on its face.  For one, the Products' UV-C light is so ineffective, the air in a room would have to be recirculated through the Products many times to only *theoretically* inactivate a material number of pathogens.  This would take many hours, during which time an occupant in the room could be exposed to a pathogen that has yet to be inactivated by the UV light.  This argument also falsely assumes that the air in a room is unchanging.  But, by their very presence, people change the air in a room.  Every breath, word, cough, or sneeze dumps countless additional microbes into the air, leaving the Products caught in

---

[9] To that end, the Air Purifiers listed in this complaint all feature substantially the same design, and any differences which may exist between them are immaterial for purposes of this action.

an endless cycle of recirculation.  It is a Sisyphean task that provides no material benefit to consumers.

73.     The UV-C bulb is a gimmick, added solely to give Defendants cover to charge a premium for their Products and to differentiate themselves from competing air purifiers.  It confers no actual benefit onto consumers who paid a price premium for Defendants' Products under the false but reasonable belief that the Air Purifiers would neutralize germs more effectively than regular HEPA-filter air purifiers without a UV-C bulb.

## CLASS ALLEGATIONS

74.     Plaintiffs seek to represent a nationwide class defined as follows (the "Nationwide Class"):

> All individual residents in the United States who purchased a GermGuardian AC4825E, AC4825W, AC4825DLX, AC4300, or replacement UV bulbs for those products, during the applicable statutory period.

75.     Plaintiffs also seek to represent a California subclass defined as follows (the "California subclass"):

> All California residents who purchased a GermGuardian AC4825E, AC4825W, AC4825DLX, AC4300, or replacement UV bulbs for those products, during the applicable statutory period.

76.     Excluded from the Classes are governmental entities, Defendants, Defendants' affiliates, parents, subsidiaries, employees, officers, directors, and co-conspirators.  Also excluded is any judicial officer presiding over this matter and the members of their immediate families and judicial staff.

77.     Plaintiffs reserve the right to modify or expand the definition of the Classes to seek recovery on behalf of additional persons as warranted as facts are learned in further investigation and discovery.

78.     Members of the Classes are so numerous that their individual joinder herein is impracticable.  The precise number of Class members and their identities are unknown to Plaintiffs at this time but will be determined through discovery of Defendants' records.  Class members may be notified of the pendency of this action by mail, email, and/or publication.

79.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  These common legal and factual questions include, but are not limited to:

        a.      Whether the Products' UV-C bulb has any material germicidal effect;

        b.      Whether Defendants' express representations about the capability of its Products included false and/or misleading statements and/or omissions;

        c.      Whether Defendants' implied representations about the capability of its Products included false and/or misleading statements;

        d.      Whether Defendants' conduct violated the CLRA, FAL, UCL;

        e.      Whether Defendants' conduct breached express and implied warranties, and amounted to fraud;

        f.      The nature of damages suffered by Plaintiffs, the Class, and Subclass.

80.     Plaintiffs' claims are typical of the claims of the proposed Classes they seek to represent because Plaintiffs, like all members of the Classes, were induced by Defendants' false and misleading warranties to purchase Defendants' Products and subsequently did purchase Defendants' Products during the relevant class periods without knowing that Defendants' claims about the Products' air purifying capabilities were false and misleading.  The representative Plaintiffs, like all members of the Classes, have been damaged by Defendants' misconduct in the very same way as the members of the Classes.  Further, the factual bases of Defendants' misconduct are common to all members of the Class and Subclass and represent a common thread of misconduct resulting in injury to all members of the Classes.

81.     Plaintiffs are adequate representatives of the Classes they seek to represent because their interests do not conflict with the interests of the members of the Classes they seek to represent, they have retained counsel competent and experienced in prosecuting class actions, and they intend to prosecute this action vigorously.  The interests of the members of the Classes will be fairly and adequately protected by Plaintiffs and their counsel.

82.     A class action is superior to other available means for the fair and efficient adjudication of the claims of the members of the Classes.  Each individual member of the Classes may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also represents a potential for inconsistent or contradictory judgments.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

<u>**COUNT I**</u>
**Violations of California's Unfair Competition Law ("UCL")**
**Business & Professions Code § 17200,** *et seq.*

83.     Plaintiffs hereby incorporate by reference the allegations contained in all proceeding paragraphs of this complaint.

84.     Plaintiffs bring this claim individually and on behalf of the members of the proposed California subclass against Defendants.

85.     This claim is brought under the laws of California.

86.     Defendants violated California's UCL by engaging in unlawful, fraudulent, and unfair conduct (*i.e.,* violating each of the three prongs of the UCL).

***The Unlawful Prong***

87.     Defendants engaged in unlawful conduct by violating the CLRA, and FAL, as referenced herein.

88.     Defendants also engaged in unlawful conduct by violating Section 5(a) of the FTC Act,[10] which states that "unfair or deceptive acts or practices in or affecting commerce … are … declared unlawful."

---

[10] *See* 15 U.S.C. § 45(a)(1).

*The Fraudulent Prong*

89.     As alleged in detail above, Defendants failed to disclose material facts about its air Purifiers, including by failing to disclose to consumers that the UV-C bulb in the Products had any material germicidal capabilities, despite expressly claiming that it did.

90.     Defendants, as manufacturers and marketers of the Products, were in a position to know the true quality and capability of their Products but affirmatively warranted that the Products had greater purifying abilities than they actually did.

91.     As a result of these false and misleading practices, Defendants induced Plaintiffs and the Subclass into purchasing the Products and replacement bulbs that Plaintiffs and the Subclass members would not have purchased, or would have paid substantially less for, had Defendants been truthful about the qualities and capabilities of its Products.

*The Unfair Prong*

92.     Defendants' conduct was unfair because, by claiming that the Air Purifiers would sanitize the air and kill a material amount of harmful pathogens through UV-C light, Defendants deceived consumers into believing that the Products were materially better than regular HEPA-filter equipped air purifiers, even though they are not.  This is unfair because it led Plaintiffs and the members of the California Subclass to purchase the Products and replacement bulbs that they otherwise would not have, or would have paid substantially less for, had they known their true capabilities.  Defendants' misleading practice is also unfair because it gives Defendants an unfair advantage over competitors.

93.     Plaintiffs and the California Subclass members could not have reasonably avoided the injury.  Only Defendants were aware that the Air Purifiers fell below the standard that they claimed.  Consumers have had no opportunity to become aware of Defendants' false and misleading representations.

***

94.     For all prongs, Defendants' false and misleading conduct was intended to induce reliance, and Plaintiffs and members of the California Subclass saw, read, and reasonably relied on

Defendants' false and misleading warranties about the ability of their Air Purifiers.  Defendants'
deceptive, misleading, and unfair conduct was a substantial factor in Plaintiffs and the California
Subclass's purchasing decisions.

95.    Defendants' misrepresentations were a substantial factor and proximately caused the
damages and loss to Plaintiffs and the California Subclass members.

96.    There was no benefit to consumers or competition from falsely claiming that the
Products were of a quality that they were not.

97.    Plaintiffs and the California Subclass members have suffered harm as a result of the
violations of the UCL because they have incurred charges and/or paid monies they otherwise
would not have incurred or paid.

### COUNT II
### Violations of California's False Advertising Law ("FAL")
### Business & Professions Code § 17500, *et seq.*

98.    Plaintiffs hereby incorporate by reference the allegations contained in the
proceeding paragraphs.

99.    Plaintiffs bring this claim individually and on behalf of the members of the
proposed California Subclass against Defendants.

100.    This claim is brought under the laws of California.

101.    California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et
seq.,* makes it "unlawful for any person to make or disseminate or cause to be made or
disseminated before the public in this state … in any advertising device … or in any other manner
or means whatever, including over the Internet, any statement, concerning … personal property or
service, … or performance or disposition thereof, which is untrue or misleading and which is
known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

102.    During the applicable statutory period, Defendants committed acts of false
advertising, as defined by the FAL, by making false and misleading representations about their
Products' ability to kill a material amount of pathogens with UV-C light, to attract more purchasers
than their Products would otherwise have received.  Likewise, Defendants' false advertising

1    induced consumers to purchase the Products and replacement bulbs, or pay more for them than

2    consumers otherwise would have.

3          103.   Defendants knew or should have known, through the exercise of reasonable care,

4    that their claims about their Products' ability to kill a material amount of pathogens with UV-C

5    light were untrue and misleading.

6          104.   Defendants' actions in violation of the FAL were false and misleading such that the

7    general public is and was likely to be deceived.

8          105.   As a direct and proximate result of these acts, consumers have been and are being

9    harmed.  Plaintiffs and the members of the California Subclass have suffered injury and actual out-

10   of-pocket losses as a result of Defendants' FAL violation because Plaintiffs and the California

11   Subclass members would not have purchased Defendants' Products and replacement bulbs or

12   would have paid substantially less for the Products had Defendants not made the false and

13   misleading statements about the Products' ability to kill a material number of pathogens with UV-

14   C light.

15         106.   Plaintiffs and the California Subclass are therefore entitled to: (a) full restitution of

16   all monies paid to Defendants as a result of their deceptive practices; (b) interest at the highest rate

17   allowed by law; and (c) the payment of Plaintiffs' attorneys' fees and costs.

18                                    **<u>COUNT III</u>**
19         **Violations of California's Consumer Legal Remedies Act ("CLRA")**
           **Cal. Civ. Code § 1750, *et seq.***

20         107.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding

21   paragraphs of this Complaint.

22         108.   Plaintiffs bring this claim individually and on behalf of the members of the

23   proposed California Subclass against Defendants.

24         109.   This claim is brought under the law of California.

25         110.   Defendants are "person[s]," as defined by Cal. Civ. Code § 1761(e).

26         111.   Plaintiffs and the California Subclass members are "consumers," as defined by Cal.

27   Civ. Code § 1761(d).

28

112.   The Products and replacement bulbs purchased by Plaintiffs and the California Subclass members are "goods" as defined by Cal. Civ. Code § 1761(a).

113.   The purchases by Plaintiffs and the California Subclass members constitute "transactions," as defined by Cal. Civ. Code § 1761(e).

114.   As alleged more fully above, Defendants has violated the CLRA by using a third-party to furnish false and misleading statements about the quality and capabilities of its Products to attract and induce more consumers to purchase its Products than would have otherwise been induced and attracted to the Products without those false and misleading statements.

115.   As a result of engaging in such conduct, Defendants have violated California Civ. Code §§ 1770(a)(5), (a)(7) and (a)(9).

116.   Defendants' conduct was likely to deceive, and did deceive, Plaintiffs and the California Subclass members, all of whom are reasonable consumers.  Defendants knew, or should have known through exercise of reasonable care, that its claims about its Products' capabilities were false and misleading.

117.   Defendants' representations about their Products' capabilities were intended to induce reliance, and Plaintiffs and the California Subclass members saw, read, and reasonably relied on the false and misleading affirmative representations when deciding to purchase Defendants' Products.  Defendants' deceptive conduct was a substantial factor in Plaintiffs' purchase decisions and the purchase decisions of the proposed California Subclass.

118.   Plaintiffs and the members of the California Subclass have suffered harm as a result of these violations of the CLRA because they incurred charges and/or paid monies for the Products that they otherwise would not have incurred or paid.

119.   On February 2, 2023, more than thirty days prior to the commencement of this action under this section, Defendants were served with a notice letter on behalf of Plaintiffs that complied in all respects with Cal. Civ. Code § 1782.  The letter advised Defendants of the specific acts and practices it committed in violation of the CLRA, and which particular sections of CLRA

Defendants breached.  Plaintiffs' counsel also demanded that Defendants cease and desist from such breaches and make full restitution by refunding the monies received therefrom.

## COUNT IV
### Fraud

120.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully stated herein.

121.    Plaintiffs bring this claim individually and on behalf of the members of the Classes against Defendants under the laws of California.

122.    As discussed above, Defendants failed to disclose material facts about the Products, namely, by failing to disclose to consumers that the UV-C light in the Products provides no material antimicrobial benefits, despite expressly claiming that it did.

123.    Defendants were in a position to know the true quality and capability of their Products but affirmatively warranted that the Products had greater ability than they actually did. Specifically, Defendants knew or should have known that the scientific consensus is that UV-C lights in consumer-grade HEPA air purifiers offer no greater sanitary benefit than HEPA-filter air purifiers alone.

124.    The misrepresentations and omissions made by Defendants, upon which Plaintiffs and the members of the Class and Subclass relied, were intended to induce and actually did induce Plaintiffs and the members of the Class and Subclass to purchase the Products.  Defendants induced Plaintiffs and the members of the Class and Subclass to purchase the Products that Plaintiffs and the members of the Class and Subclass would not have purchased, or would have paid substantially less for, had Defendants been truthful about their Products' qualities and capabilities.

125.    Defendants' fraudulent actions caused damages to Plaintiffs, the Class, and Subclass members, who are entitled to damages and other legal and equitable relief as a result.

## COUNT V
### Breach of Express Warranty

126.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

127.     Plaintiffs bring this claim individually and on behalf of members of the proposed Nationwide Class and California Subclass against Defendants.

128.     Defendants' affirmation of fact that the Products could effectively kill a material amount of microbes with UV-C light was the basis of the bargain between Defendants, Plaintiffs, the Class and Subclass, thereby creating express warranties that the Products would conform to Defendants' affirmations of fact and description.

129.     Plaintiffs and the members of the Nationwide Class and the California Subclass were injured as a direct and proximate result of Defendants' breach because: (a) they would not have purchased the Products if they had known the true facts; (b) they paid for the Products due to Defendants' false and misleading claims about the Products' capabilities; (c) they would not have purchased the Products on the same terms if they had known the true facts; (d) they paid a price premium for the Products due to Defendants' false and misleading affirmations of fact; and (e) the Products did not have the characteristics, qualities, and capabilities that Defendants promised.

130.     On September 01, 2023, prior to filing this action, Defendants were served with a pre-suit notice letter on behalf of Plaintiffs that complied in all respects with U.C.C. §§ 2-313 and 2-607.  Plaintiffs' counsel sent Defendants a letter advising Defendants that they breached an express warranty and demanded that Defendants cease and desist from such breaches and make full restitution by refunding the monies received therefrom.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court grant Plaintiffs and all members of the proposed Class and California Subclass the following relief against Defendants:

(a)     For an order certifying the Nationwide Class and California Subclass and naming Plaintiffs' attorneys as Class Counsel to represent the members of the Classes;

1      (b)     For an order declaring that Defendants' conduct violates the statutes reference

2             herein;

3      (c)     For compensatory, statutory, and punitive damages in amounts to be determined by

4             the Court and/or jury;

5      (d)     For prejudgment interest on all amounts awarded;

6      (e)     For an order of restitution and all other forms of equitable monetary relief;

7      (f)     For an order requiring Defendants to undertake a corrective advertising campaign;

8      (g)     For an order awarding Plaintiffs and the Class and Subclass their reasonable

9             attorneys' fees and expenses and costs of suit; and

10     (h)     Granting such other and further relief as may be just and proper.

11                          **<u>JURY DEMAND</u>**

12    Plaintiffs demand a trial by jury of all issues so triable.

13

14

15   Dated: September 12, 2023            Respectfully submitted,

16                           **BURSOR & FISHER, P.A.**

17                           By:     */s/ L. Timothy Fisher*
                                    L. Timothy Fisher

18                           L. Timothy Fisher (State Bar No. 191626)

19                           Luke W. Sironski-White (State Bar No. 348441)
                           1990 North California Blvd., Suite 940

20                           Walnut Creek, CA 94596
                           Telephone: (925) 300-4455

21                           Facsimile:  (925) 407-2700
                           E-mail: ltfisher@bursor.com

22                                        lsironski@bursor.com

23                           **FARNESE PC**
                           Peter J. Farnese (State Bar No. 251204)

24                           700 S. Flower St.
                           Suite 1000

25                           Los Angeles, CA 90017
                           Telephone: (855) 935-5322

26                           E-mail: pjf@farneselaw.com

27                           **SINDERBRAND LAW GROUP, P.C**.
                           Greg Sinderbrand (State Bar No. 179586)

28

---

CLASS ACTION COMPLAINT                                       29

5805 Sepulveda Blvd. #801
Sherman Oaks, CA 91403
Telephone: (818) 370-3912
E-mail: greg@sinderbrandlaw.com

*Attorneys for Plaintiffs*

**<u>CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)</u>**

I, L. Timothy Fisher, declare as follows:

1.      I am counsel for Plaintiffs, and I am a partner at Bursor & Fisher, P.A.  I make this declaration to the best of my knowledge, information, and belief of the facts stated herein.

2.      The complaint filed in this action is filed in the proper place for trial because many of the acts and transactions giving rise to this action occurred in this District, and because Plaintiffs Lisa Felice and Nicholas Poston reside in this District.

3.      Plaintiff Lisa Felice is a resident of San Leandro, California.

4.      Plaintiff Nicholas Poston is a resident of Castro Valley, California.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct, executed on September 12, 2023, at Walnut Creek, California.

_/s/ L. Timothy Fisher_____
L. Timothy Fisher